2021 UT App 34

# THE UTAH COURT OF APPEALS

TAWNYA BRIMHALL AND ERIC BRIMHALL,
Appellants,
*v.*
DITECH FINANCIAL LLC AND DITECH MORTGAGE CORPORATION,
Appellees.

Opinion
No. 20180544-CA
Filed April 1, 2021

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 160906722

Judson T. Pitts, Attorney for Appellants

Alex B. Leeman and Matthew O. Stromquist,
Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Ditech Financial LLC (Ditech) pursued non-judicial foreclosure after Tawnya and Eric Brimhall defaulted on their mortgage loan.[1] The Brimhalls sought foreclosure relief, but

---

1. The loan documents identify the borrower as "Tawnya D. Brimhall, a married woman as her sole and separate property." And all the foreclosure correspondence is addressed only to Tawnya. However, because the Brimhalls jointly filed the original complaint and jointly appealed the decision of the district court, we refer to the parties collectively in this opinion. Where appropriate, we refer to Tawnya and Eric by their first names for clarity and ease of reference.

Ditech asserted that the Brimhalls' loss mitigation application was incomplete and that Ditech was therefore unable to review it. The Brimhalls sued Ditech after a trustee's sale of their property, contending they had timely submitted a complete application for mortgage relief and were still negotiating foreclosure relief with Ditech, a situation which they claim should have precluded Ditech from scheduling and conducting a trustee's sale. The district court granted summary judgment in favor of Ditech. The Brimhalls appealed, and we reverse and remand.

### BACKGROUND[2]

¶2     In 2007, the Brimhalls borrowed $268,000 from Countrywide Home Loans to purchase a house in Utah (the Property). The loan was secured by a deed of trust on the Property. The beneficial interest under that deed of trust was subsequently assigned to the Bank of New York Mellon (BNYM). BNYM retained Green Tree Servicing, which later became Ditech, as the loan servicer.

¶3     The Brimhalls defaulted on the loan in 2013, and Ditech sent a letter by certified mail, dated January 17, 2014, informing the Brimhalls of the default, specifically indicating that they had fifty payments past due. The successor trustee recorded a notice of default and provided legal notice to the Brimhalls of the default, the amount of debt, and the fact that the loan had been referred for foreclosure.

¶4     In July 2014, the Brimhalls jointly filed for bankruptcy, an event which suspended the foreclosure proceedings until

---

2. "In reviewing a grant of summary judgment, we recite the undisputed facts. To the extent that the facts are disputed, we recite the disputed facts in a light most favorable to the nonmoving party." *Northern Monticello All. LLC v. San Juan County*, 2020 UT App 79, n.1, 468 P.3d 537 (quotation simplified).

January 2016, when the bankruptcy court entered an order terminating the automatic stay.

¶5 On February 25, 2016, Ditech sent the Brimhalls a letter regarding loss mitigation, a process through which borrowers and loan servicers can potentially work together to avoid foreclosure. The letter explained available loss mitigation options and advised the Brimhalls to act quickly to avoid losing the Property. The letter included a request for mortgage assistance (RMA) application for the Brimhalls' use and urged the Brimhalls to "read these instructions carefully and complete the [RMA] application in its entirety so that Ditech may evaluate [their] eligibility for a loss mitigation option." The RMA "forms provid[ed] a list of the documents required for a complete loss mitigation application" and stated that the Brimhalls needed to "fill out and execute the [RMA] forms and provide all the applicable documents within thirty (30) days." The letter indicated that the RMA and required documents could be submitted by mail or fax. By way of explanation, the letter went on to clarify that the Brimhalls could contact their Ditech account representative once all the documents had been received to discuss mitigation options. Lastly, the letter informed the Brimhalls that if their RMA application was denied, they would receive a letter giving the reason for the denial. The letter also stated that "no foreclosure sale [would] be conducted while Ditech [was] reviewing the application," provided that the application was received by Ditech "more than 37 days prior to foreclosure sale."[3] Tawnya asserted that she "began the process

---

3. This thirty-seven-day period is mandated by federal law, *see* 12 C.F.R. § 1024.41(g) (2020), which prohibits a foreclosure sale if a borrower has submitted a complete RMA application after a notice of a foreclosure process was filed "but more than 37 days before a foreclosure sale, . . . unless: (1) The servicer has sent the borrower a notice . . . that the borrower is not eligible for any loss mitigation option and" any appeals are denied, not applicable, or not requested; "(2) The borrower rejects all loss

(continued…)

of submitting paperwork and a formal application for a loan modification" after receiving this information from Ditech.

¶6      On March 21, Ditech notified the Brimhalls by letter that their RMA application was incomplete. In addition to repeating the deadline for completing the RMA application, the letter specifically identified certain documents that remained missing from the Brimhalls' application: a profit/loss statement and pay stubs. This letter informed the Brimhalls that Ditech would "not be able to move forward with review of [the RMA] application" unless it received the "required documents" by April 20. Ditech asserted that the Brimhalls failed to submit the required documentary information necessary to complete the RMA application by the April 20 deadline. However, the Brimhalls contended that they did, in fact, submit the required documentation prior to the deadline.

¶7      On April 26, Ditech sent a notice to the Brimhalls informing them that their RMA application remained incomplete and that because the Brimhalls had "not provided [Ditech] with all of the required information within the time frame requested," Ditech would "not be reviewing [their RMA] application at this time." Nevertheless, the letter informed the Brimhalls that they could contact Ditech "to discuss [their] situation and any loss mitigation that may still be available," including reinstatement (i.e., immediately bringing the account current), a repayment plan (i.e., requiring the Brimhalls to repay a fraction of the delinquent amount in addition to the regular payment each month), a forbearance (i.e., delaying foreclosure to allow time for the Brimhalls to bring their account current), a modification (i.e., adding the delinquent amount back into the loan), a short sale (i.e., selling the Property to settle the debt), or a deed-in-lieu (i.e., voluntarily deeding the Property back to Ditech).

---

(…continued)
mitigation options offered by the servicer; or (3) The borrower fails to perform under an agreement on a loss mitigation option," *id*.

¶8 The Brimhalls asserted that they fully complied with Ditech's requests to submit a complete RMA application. Specifically, Tawnya stated in her affidavit filed in support of the Brimhalls' motion for summary judgment that she had submitted two complete RMA applications "in the first four months of 2016" and that "even though Ditech had sent [her] letters stating that [Ditech was] no longer considering" the RMA application because the "files were not 'complete,'" (1) she "had sent all requested documents," (2) she "was still engaged in phone communications from May–August 2016," and (3) Ditech "representatives . . . were asking [her] to update documents in their system and submit new documents they had misplaced." Similarly, Eric stated in a declaration that he "had been frustrated with Ditech for months, because [he and Tawnya] had jointly prepared two prior RMA's for Ditech and had sent Ditech every form and piece of information that Ditech had requested, to the best of [their] knowledge and understanding, to complete [their] prior RMA's, but Ditech would never acknowledge receiving what [they] sent."

¶9 On July 1, the successor trustee issued a notice of sale of the Property, scheduled for August 16, posting it on the Property and in the county recorder's office, as well as publishing it in a local newspaper. On July 11, the Brimhalls received another letter from Ditech informing them that they were "not eligible for mortgage modification assistance" because they had "failed to timely return the documents requested by the program requirements."

¶10 Eric contended that when he called Ditech on July 15 to inquire about the status of the RMA application, he was told that the RMA "had been denied" by letter on July 11. He stated that at that time Ditech encouraged him to submit another RMA application. He claims that Ditech "interviewed" him "to qualify" for "a third RMA offer from Ditech that would arrive shortly at the office" of the Brimhalls' bankruptcy attorney. Eric's declaration stated that the Ditech agent assured him that the sale of the Property "would be stopped and that [the Brimhalls] would receive another packet to begin the loan

modification process again, and then would have 30 days to get information back to them."

¶11 Regarding the July 15 phone conversation, Ditech's representative averred, in an affidavit filed in support of Ditech's motion for summary judgment, that its agent explained to Eric that the RMA "application had been denied due to a number of documents that were missing, and provided him a fax number to which he could submit the missing documents." The representative further stated, "At no point in the course of the telephone call did Ditech state or represent in any way that the trustee's sale scheduled for August 16, 2016, would be stopped or cancelled."

¶12 Ditech recorded the July 15 phone conversation, a copy of which it submitted in conjunction with the affidavit of the Ditech representative who had knowledge of the events surrounding the Brimhalls' interaction with Ditech. The Brimhalls acknowledged that the recording of the "phone call does not appear to contain any discussion of the Trustee's sale at all," but they pointed to "long pauses in the call that could call the authenticity of the recording into question." Even though the recording lacks mention of postponing the sale, "the Brimhalls recall[ed] that postponement of the sale was discussed" in the July 15 phone call. On appeal, the Brimhalls do not contend that Ditech represented that the trustee's sale would be stopped.

¶13 On July 30, not having received the RMA forms from Ditech, Eric stated that he again called Ditech to follow up on their request for mortgage assistance. Following that call, the Brimhalls received a letter, which was addressed to Tawnya and dated July 15, encouraging them to apply for mortgage modification. A blank RMA form was attached to the letter. The Brimhalls maintain that they submitted their third RMA application after receiving these forms.

¶14 Having seen no update on the status of the latest RMA application in their online account with Ditech—which characterized the application's status as "received and . . . under

review"—the Brimhalls claimed that they called Ditech several times during the next few weeks. The Brimhalls provided the first names of four different Ditech representatives with whom they claimed to have either spoken or left messages regarding their RMA applications. The Brimhalls further asserted to have left "dozens of voice-messages . . . with Ditech."

¶15 On August 16, the Property was sold to BNYM as the beneficiary of the deed of trust at the trustee's sale. Even after the Property was sold, the Brimhalls continued to contact Ditech about the status of their RMA application. When they checked their online Ditech account on September 2, the Brimhalls found an update informing them that Ditech was "[u]nable to approve [their] application for loss mitigation."

¶16 On October 28, the Brimhalls filed suit against both Ditech and BNYM seeking, among other things, a declaratory judgment that Ditech had unlawfully foreclosed on the Property because it had not complied with the statutory notice requirements (RMA suit). *See* Utah Code Ann. § 57-1-24.3(5)–(6) (LexisNexis Supp. 2020) (prohibiting a trustee's sale of the property of a default trustor who has applied for foreclosure relief until the servicer gives written notice of the decision regarding foreclosure relief to the default trustor).[4] They also sought injunctive relief to prevent Ditech from advancing any eviction process. However, even though the Brimhalls listed BNYM in the caption of the RMA suit, their complaint contains no other mention of BNYM and did not actually state a cause of action against it. In addition, while the Brimhalls served Ditech in the RMA suit, they did not timely serve BNYM.

¶17 Approximately a year later, in October 2017, BNYM filed a separate unlawful detainer action against the Brimhalls (eviction suit), and the Brimhalls moved to consolidate that action with the still-pending RMA suit. A few weeks later, the

---

4. Because there have been no substantive changes to the relevant statutes, we cite the current version of the Utah Code.

Brimhalls also filed a motion for summary judgment in the RMA suit, arguing that Ditech violated Utah law by scheduling a sale of the Property before written notice was given denying their RMA application. Ditech filed a cross-motion for summary judgment, arguing that it had fully complied with Utah law governing the trustee's sale.

¶18  In a telephonic hearing, the district court took up the Brimhalls' motion to consolidate by asking the Brimhalls' counsel to address rule 4 of the Utah Rules of Civil Procedure, which states, "If the summons and complaint are not timely served, the action against the unserved defendant may be dismissed without prejudice on motion of any party or on the court's own initiative." *See* Utah R. Civ. P. 4(b). The court inquired, "How can we move this [RMA suit] forward because you failed to serve [BNYM]?" In response, the Brimhalls' counsel stated,

> Look, I'm absolutely happy if the court wants to dismiss [BNYM] without prejudice. We'll just bring the claims in the other suit [i.e., the eviction suit]. I mean, rule 4 says dismiss it without prejudice. I'd entertain that motion. I'll make the oral motion right now, today, with the court to dismiss [BNYM] from this action without prejudice immediately, today.

(Quotation simplified.) For its part, Ditech argued that the two actions should not be consolidated:

> [Ditech is] the servicing agent for the mortgage. . . . [T]he claims that are brought in this [RMA suit] . . . have to do with the servicing of the mortgage, not the validity of the underlying mortgage, whether it really exists . . . . It has to do with whether Ditech properly followed the law in foreclosing on a property. Those are claims against Ditech.

¶19  Noting that the Brimhalls had stipulated to BNYM's dismissal, the court denied the motion to consolidate and dismissed BNYM without prejudice, reasoning that the Brimhalls' RMA suit and BNYM's eviction suit were "at two different stages of litigation, and consolidation would prolong [the RMA suit]." Further, the court noted that BNYM was not a party to the RMA suit because the Brimhalls failed to serve BNYM and that "[i]t would not promote judicial economy to allow the consolidation."

¶20  In March 2018, the Brimhalls moved to dismiss the RMA suit, arguing that the district court's "sua sponte" dismissal of BNYM deprived the action of an "indispensable party," thus placing the action "outside the scope of the [c]ourt's jurisdiction." *See* Utah R. Civ. P. 19(a)–(b).[5]

¶21  Two months later, the court issued a memorandum decision and order addressing the Brimhalls' motion for summary judgment, the Brimhalls' motion to dismiss, and Ditech's cross-motion for summary judgment. The court noted that the Brimhalls had submitted an RMA application in February 2016 but that Ditech had notified them their application was incomplete and they needed to submit the missing documents by April 20, 2016. The court determined that "[t]he Brimhalls did not submit the documents, and on April 26, Ditech sent a letter stating that it would not review the application because the Brimhalls had not complied with the deadline." Based on this sequence of events, the court concluded that Ditech had complied with the statutory notice requirements regarding the trustee's sale in the context of foreclosure relief. While the court acknowledged that the Brimhalls presented a different account of their interaction with Ditech and Ditech's alleged promises to stop the trustee's sale, the court determined that it "need not address [Tawnya's] affidavit because it was

---

5. Though the Brimhalls characterize the decision as "sua sponte," we note that their counsel appears to have stipulated to the dismissal of BNYM. *See supra* ¶ 18.

filed in her own motion for summary judgment and was not included in her opposition to Ditech's cross-motion." The court further characterized Tawnya's affidavit as "self-serving" and noted that Ditech's "concerns [about the affidavit] are valid." The court thus granted Ditech's cross-motion for summary judgment and denied the Brimhalls' motion for summary judgment and motion to dismiss "as moot." The Brimhalls appeal.

ISSUES AND STANDARDS OF REVIEW

¶22     The Brimhalls first contend that because BNYM was a necessary and indispensable party to their declaratory judgment action, the district court deprived itself of jurisdiction when it dismissed BNYM from the lawsuit. We review a district court's determination about whether a party is indispensable to an action for an abuse of discretion. *See Seftel v. Capital City Bank*, 767 P.2d 941, 944–45 (Utah Ct. App. 1989), *aff'd sub nom. Landes v. Capital City Bank*, 795 P.2d 1127 (Utah 1990).

¶23     The Brimhalls next challenge the district court's grant of Ditech's motion for summary judgment, arguing that in refusing to consider all the affidavit evidence from the Brimhalls, the court "failed to legally abide by the standards for evaluating summary judgment motions." "[W]e review a district court's grant of summary judgment for correctness, affording that ruling no deference." *Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 10, 470 P.3d 479.

¶24     The Brimhalls' final claim is that the district court erroneously applied a federal regulation instead of the applicable Utah statute, *compare* 12 C.F.R. § 1024.41(g) (2020), *with* Utah Code Ann. § 57-1-24.3(6) (LexisNexis Supp. 2020), in reaching its determination that Ditech complied with the statutory notice requirements relevant to foreclosure on the Property in the context of a defaulting party's request for mortgage relief. "The proper interpretation and application of a statute is a question of law which we review for correctness,

affording no deference to the district court's legal conclusions." *Bott v. Osburn*, 2011 UT App 139, ¶ 5, 257 P.3d 1022 (quotation simplified).

ANALYSIS

I. The Dismissal of BNYM

¶25    The Brimhalls assert that the district "court lost jurisdiction to adjudicate [their motion for summary judgment and Ditech's cross-motion for summary judgment] and render any decision when it dismissed [BNYM], sua sponte, from the action" because BNYM was "a necessary and indispensable party to the action."

¶26    Pursuant to rule 19 of the Utah Rules of Civil Procedure, "a court must engage in a two-part inquiry" to determine whether joinder is required. *See Mower v. Simpson*, 2012 UT App 149, ¶ 27, 278 P.3d 1076. "First, the court must ascertain whether a party has sufficient interest in the action to make it a necessary party. . . . Second, if the court indeed deems the party necessary to the action, and joinder is unfeasible, the court must then determine whether the party is indispensable." *Turville v. J & J Props., LC*, 2006 UT App 305, ¶¶ 36–37, 145 P.3d 1146 (quotation simplified). In other words, "a court is required to address indispensability under rule 19(b) only if it first finds that joinder of the party is necessary." *Central Utah Water Conservancy Dist. v. Upper East Union Irrigation Co.*, 2013 UT 67, ¶ 58, 321 P.3d 1113.

¶27    Here, BNYM was not a necessary party to the Brimhalls' claims against Ditech. The Brimhalls' RMA suit alleged that Ditech wrongfully foreclosed on the Property because it improperly noticed the trustee's sale after the Brimhalls had initiated foreclosure relief. The Brimhalls' claim of wrongdoing in the RMA suit concerned alleged irregularities in the timing of the notice of the trustee's sale on the part of the loan servicer—Ditech—not the assignee—BNYM. And while the Brimhalls challenged BNYM's title to the Property obtained in the trustee's

sale, they did not and do not challenge the validity of the underlying obligation secured by the Property. Indeed, the allegations of wrongdoing in the RMA suit solely concern Ditech's alleged failure to comply with state and federal law in the timing of the trustee's sale. And even in the absence of BNYM, complete relief can be granted to Ditech and to the Brimhalls on the question of whether Ditech complied with statutory foreclosure requirements.

¶28    The Brimhalls point us to no authority, and we are not aware of any, that indicates a lender is a necessary party to adjudicate the alleged wrongdoing on the part of a loan servicer in this context. Instead, authority on point indictates that BNYM was not a necessary party. Indeed, "[w]here a plaintiff makes no claims against the unjoined party, it is clear under rule 19 that complete relief can be granted in its absence." *White v. Jeppson*, 2014 UT App 90, ¶ 16, 325 P.3d 888 (quotation simplified). "Such is the case here. [The Brimhalls] have made no claims against [BNYM] in [the RMA suit]. Indeed, [the Brimhalls'] claims in this case were expressly limited to [Ditech's] acts or omissions . . . ." *See id.* (quotation simplified). Moreover, BNYM has "already sought resolution" of any claims it might have against the Brimhalls in the separate eviction suit. *See id.* "Accordingly, as [the Brimhalls'] claims are strictly limited to [Ditech's] conduct, complete relief can be granted [between the Brimhalls and Ditech] without joining" BNYM. *See id.* Thus, even if we assume, without deciding, that the Brimhalls did not invite any error on the court's part by stipulating to the dismissal of BNYM, the district court's dismissal of BNYM did not violate rule 19 because BNYM's involvement was not necessary to determine whether Ditech complied with the statutory notice requirements delineated in the foreclosure process.

## II. The Grant of Ditech's Motion for Summary Judgment

¶29    Next, the Brimhalls challenge the district court's grant of summary judgment in favor of Ditech, asserting that a factual question exists as to whether they timely submitted all the necessary documents to complete their RMA application. "It is

well established that summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gonzalez v. Cullimore*, 2018 UT 9, ¶ 35, 417 P.3d 129 (quotation simplified); *see also* Utah R. Civ. P. 56; *Northgate Village Dev., LC v. Orem City*, 2014 UT App 86, ¶ 20, 325 P.3d 123 ("A disputed fact is material if it affects the rights and liabilities of the parties.").

¶30 Here, the district court erred in granting Ditech's cross-motion for summary judgment precisely because a dispute of material fact existed as to whether the Brimhalls timely supplied all the required documentation requested by Ditech to support their application for mortgage relief. Ditech claims that the Brimhalls did not submit the required documentation to complete their application by Ditech's deadline of April 20. The court determined that Ditech had sent correspondence to the Brimhalls informing them that their application for loss mitigation was incomplete. After the Brimhalls failed to submit the required documents, Ditech then informed them on April 26 that their application remained incomplete and that Ditech was therefore unable to review their application further. The court concluded that the notice of trustee's sale was not issued until early July, well after the thirty-seven-day period required by federal regulation. *See also* 12 C.F.R. § 1024.41(g) (2020).

¶31 But neither Ditech nor the court acknowledged the import of Tawnya's affidavit, which stated that as of July 1, 2016, she was actively negotiating mortgage relief and that she had submitted all requested documents:

> I had submitted two [RMA applications] in the first four months of 2016, and even though Ditech had sent me letters stating that they were no longer considering my requests because, according to them, my files were not "complete," I had sent all

requested documents, I had completed my files, but most importantly, I was still engaged in phone communications from May–August 2016 with [Ditech] representatives who were asking me to update documents in their system and submit new documents they had misplaced.

¶32 In addition, Eric's declaration went unnoticed by the court. There, Eric stated that he "had been frustrated with Ditech for months," explaining,

> [M]y wife and I had jointly prepared two prior [RMA applications] for Ditech and had sent Ditech every form and piece of information that Ditech had requested, . . . but Ditech would never acknowledge receiving what I sent. I provided RMA documents and information to Ditech representatives by fax, and e-mail, however no matter how many times I provided the information, Ditech would inform me on my follow-up calls that the information was not received.

The Brimhalls' sworn statements create a dispute of material fact that precludes summary judgment on the question of whether the Brimhalls' RMA application was complete. In a nutshell, the Brimhalls assert that they repeatedly submitted all the required RMA documents in a timely fashion; Ditech says that they did not.

¶33 The district court did not make any mention of the assertions Eric made in his declaration. And as to Tawnya's affidavit, the court determined that it "need not address [it] because it was filed in her own motion for summary judgment and was not included in her opposition to Ditech's cross-motion." This reasoning is incorrect. While the Brimhalls did not attach Tawnya's affidavit to the opposition filing, they explicitly cited it several times and quoted from it extensively in that

filing, and the district court could not ignore it solely on the grounds that it was not attached. Indeed, rule 56 of the Utah Rules of Civil Procedure does not require that affidavits be filed in opposition to a motion for summary judgment to be considered: "A party asserting that a fact cannot be genuinely disputed or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Utah R. Civ. P. 56(c)(1). And rather than being limited to considering only materials filed alongside a motion, a court considering a summary judgment motion "may consider other materials in the record." *Id.* R. 56(c)(3).[6]

¶34   The conflicting accounts offered by the Brimhalls and Ditech constitute a classic example of a dispute of a material fact that precludes resolution by summary judgment. *See iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶ 49, 424 P.3d

---

6. Ditech's opposition to Tawnya's affidavit is directed primarily at her allegations about what a Ditech representative said during the July 15 telephone call. *See supra* ¶¶ 10–12. Ditech contends that these allegations were not based on Tawnya's personal knowledge of that conversation, because she did not personally participate in the call, but rather they were based on the notes she took from Eric's telephone conversation with Ditech. This may be a valid complaint about those allegations specific to the telephone conversation, but it is not valid as to other points in Tawnya's affidavit, such as whether the Brimhalls timely submitted the required documents to complete their application. *See* Utah R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, must set out facts that would be admissible in evidence, and must show that the affiant or declarant is competent to testify on the matters stated.").

970; *see also Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 ("In determining whether a factual dispute exists, we apply an objective standard. The objective standard asks whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." (quotation simplified)). Thus, we conclude that the district court erred in granting summary judgment to Ditech because there remains a dispute of material fact about whether the Brimhalls timely submitted the required documentation to comply with Ditech's instructions for mortgage relief.

### III. The Statutory Notice Requirement

¶35 If on remand the factual dispute is resolved in Ditech's favor and it is determined that the Brimhalls did not timely submit the requested documentation to complete their RMA application, the question will arise as to whether Ditech's statutory duties under Utah law to notice the trustee's sale were retriggered by the Brimhalls' further attempts to apply for loss mitigation and by Ditech's continuing communication with the Brimhalls about additional loss mitigation applications. So while our determination that the district court erred in granting summary judgment to Ditech forms the sole basis for our reversal, we nevertheless proceed to address the statutory issue fully briefed on appeal because it may very well "arise again on remand," and we offer the district court some "guidance" in that regard. *See Francis v. National DME*, 2015 UT App 119, ¶ 53, 350 P.3d 615; *see also Salt Lake City v. Jaramillo*, 2007 UT App 32, ¶ 23, 156 P.3d 839 (Orme, J., concurring and dissenting) (noting "the oft-repeated and sound prescription, underpinned by considerations of efficiency and judicial economy, that appellate courts should offer guidance to trial courts on issues likely to surface on remand").

¶36 Utah law allows a trustee to sell property in default by filing a notice of default and, "after the lapse of at least three months," by mailing notice of the time and place of the sale to the interested parties and publishing that same information. *See*

Utah Code Ann. § 57-1-24 (LexisNexis 2010); *id.* §§ 57-1-25, -26 (Supp. 2020). In the notice of default sent to a default trustor, the servicer must "direct the default trustor to contact the single point of contact regarding foreclosure relief available through the beneficiary or servicer for which a default trustor may apply, if the beneficiary or servicer offers foreclosure relief." *Id.* § 57-1-24.3(2)(b)(iv) (Supp. 2020).[7] A borrower who seeks foreclosure relief must timely provide all requested information to the loan servicer: "A default trustor shall, within the time required by the beneficiary or servicer, provide all financial and other information requested by the single point of contact to enable the beneficiary or servicer to determine whether the default trustor qualifies for the foreclosure relief for which the default trustor applies." *Id.* § 57-1-24.3(4). Utah law appears to be silent about the minimum period of time that a servicer must give the default trustor to submit the requested documents. After the servicer has made a decision about the request for foreclosure relief, the "single point of contact" designated by the loan servicer shall then "notify the default trustor by written notice of the decision of the beneficiary or servicer regarding the foreclosure relief for which the default trustor applies." *Id.* § 57-1-24.3(5)(d). And "[n]otice of a trustee's sale may not be given . . . with respect to the trust property of a default trustor who has applied for foreclosure relief until after the single point of contact provides the notice required by Subsection (5)(d)." *Id.* § 57-1-24.3(6).

¶37　The issue that arises under the Utah statutory scheme is whether it allows a borrower in default to submit multiple applications for foreclosure relief, each time retriggering the statutory notice requirements and potentially preventing a servicer from scheduling a trustee's sale due to the pending

---

7. "Single point of contact" means a person, designated by the servicer, to coordinate and communicate with a default trustor and represent the servicer in foreclosure proceedings initiated by the servicer. *See* Utah Code Ann. § 57-1-24.3(1)(i) (LexisNexis Supp. 2020).

application for foreclosure relief. This retriggering issue is relevant here because if on remand the district court resolves the disputed factual issue in favor of Ditech and determines that the Brimhalls failed to timely submit all the required documents prior to the April 20 deadline, *see supra* ¶¶ 6–7, then the Brimhalls have indicated they will argue that Ditech did not timely notify them that their second and third RMAs, *see supra* ¶¶ 8, 13, had been denied and, consequently, that notice of the August 16, 2016 trustee's sale, *see supra* ¶ 9, was premature and contrary to Utah law as it preceded the servicer's decision on a pending application for foreclosure relief. In fact, on appeal, the Brimhalls make this very argument, asserting that "nothing in [Utah Code section 57-1-24.3(6)] suggests that one denial notice covers subsequent requests/applications for relief." Similarly, the Brimhalls will likely argue that Ditech's continued communications with them about options to avoid foreclosure amounted to "dual tracking" and precluded Ditech from noticing up the trustee's sale.[8] Indeed, the Brimhalls also advance this argument on appeal: "[Tawnya] asserted that Ditech representatives continued the mortgage relief process with her long after the April 26, 2016 denial letter was issued, and by doing so, led her to believe that her application(s) were still being considered." We are not persuaded that the Brimhalls' serial-application reading of Utah Code section 57-1-24.3 is correct.

¶38     As a threshold matter, the Brimhalls cite no authority to support the serial-application reading of the Utah statute. Indeed, the Brimhalls conceded below that "there is no case-law" to support a reading of Utah Code section 57-1-24.3 as requiring "a denial letter for each separate application" or "that each time Ditech provided the Brimhalls with a new RMA . . . form to

---

8. "Dual tracking is the term given to situations in which the lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options." *Gresham v. Wells Fargo Bank, NA*, 642 F. App'x 355, 359 (5th Cir. 2016).

complete and return, it constituted a new application that required consideration by the beneficiary, and either approval or denial."

¶39    Instead, the Brimhalls argue that the statutory language itself compels their interpretation. However, the statute is entirely silent about the treatment of serial applications. "When the statutory language is silent, legislative intent can be gleaned from the purposes and underlying policies of the statute, along with the consequences of various interpretations." *State v. Mootz*, 808 N.W.2d 207, 221 (Iowa 2012), *quoted with approval in Cox v. Laycock*, 2015 UT 20, ¶ 42 n.48, 345 P.3d 689; *see also Griffin v. Griffin*, 2014 ME 70, ¶ 18, 92 A.3d 1144 ("If the statutory language . . . is silent on a particular point, we will then consider other indicia of legislative intent including the purpose of the statute." (quotation simplified)), *quoted with approval in Cox*, 2015 UT 20, ¶ 42 n.48. In this context, "we analyze the [statute] in its entirety and harmonize its provisions in accordance with the legislative intent and purpose." *See Cox*, 2015 UT 20, ¶ 42 (quotation simplified). For the following reasons, we determine that Utah Code section 57-1-24.3(6) allows a servicer to proceed with a foreclosure sale after the first loss mitigation application has been properly denied, even if subsequent applications remain pending.[9]

---

9. The Brimhalls argue that the district court erroneously applied a federal regulation instead of the Utah statute in granting Ditech's motion for summary judgment. We agree with the Brimhalls that the federal regulation is of limited application here, where the Brimhalls allege Ditech violated the Utah statute and not federal law.

    Under federal regulations, when a servicer receives an application for foreclosure relief from a default borrower, the servicer must postpone any scheduled sale if it receives a "complete" application more than thirty-seven days prior to the scheduled sale. *See* 12 C.F.R. § 1024.41(g) (2020). And any sale is further prohibited until the servicer provides written notice to

(continued…)

¶40    We disagree with the Brimhall's reading of the statute. Adopting the reading that they advocate—namely, that each new RMA application requires a separate denial notification from the beneficiary or servicer—would yield absurd results. *See Anderson v. Utah County*, 368 P.2d 912, 913 n.3 (Utah 1962)

---

(…continued)
the borrower that the borrower is not eligible for foreclosure relief. *See id.* Regarding duplicative requests, "[a] servicer must comply with the requirements of [12 C.F.R. section 1024.41] for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a *complete* loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application." *Id.* § 1024.41(i) (emphasis added). Federal courts have clarified that this postponement of a trustee's sale applies only to the first loss mitigation application submitted by a borrower. *See Wentzell v. JPMorgan Chase Bank, Nat'l Ass'n*, 627 F. App'x 314, 318 n.4 (5th Cir. 2015) ("The federal restrictions, however, apply only to a borrower's first loss mitigation application."); *accord Bennett v. Bank of Am., NA*, 126 F. Supp. 3d 871, 884 (E.D. Ky. 2015).

The issue on appeal is not whether the Brimhalls submitted multiple *complete* applications, which is the circumstance addressed by 12 C.F.R. section 1024.41(g), (i). Rather, the Brimhalls contend that they submitted a complete application by April 20, while Ditech maintains that they did not. Thus, the scope of the issue on appeal makes the federal regulation of limited applicability here. The precise issue we leave for the district court to resolve on remand is whether the Brimhalls timely submitted a complete first application by April 20. If the court determines that the Brimhalls failed to do so and that Ditech properly notified them of the denial of the application on this basis, then, as we explain, *see infra* ¶¶ 40–41, the subsequent submission of additional applications for mortgage relief, whether complete or not, would not have required Ditech to re-notice the trustee's sale under Utah law.

("Unreasonable, absurd, or ridiculous consequences [resulting from a statutory construction] should be avoided." (quotation simplified)). Such an interpretation would allow a default borrower to continually delay a trustee's sale merely by submitting new applications for foreclosure relief in serial fashion. This would be a problematic reading of the statute because it could allow a default borrower to delay a trustee's sale in perpetuity. *See Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶ 81 n.29, 445 P.3d 474 ("In cases presenting two plausible readings, the absurd consequences canon, generally speaking, causes us to prefer the more reasonable interpretation, even if the less reasonable interpretation could not be accurately described as absurd." (quotation simplified)). To allow a default trustor a meaningful opportunity to seek foreclosure relief but to avoid the absurd result of a default borrower endlessly delaying a trustee's sale by the serial filing of loss mitigation applications, the most plausible reading of the Utah statute is that a servicer complies with section 57-1-24.3(5)(d), and can thereafter notice a trustee's sale as stated in section 57-1-24.3(6), after providing written notice of the decision regarding foreclosure relief on a default trustor's first application for foreclosure relief. *See Startz v. JPMorgan Chase Bank, NA*, No. 2:16-cv-09627-ODW (PLA), 2017 WL 2218306, at *4 (C.D. Cal. May 19, 2017) (noting that, in the context of multiple RMAs, "[w]hile ejection from one's home is certainly a distressing prospect, no lender can be expected to indefinitely forgive missed payments for a debt that the homeowner has no reasonable prospect of satisfying"). While a servicer may, in its discretion, consider subsequent foreclosure relief applications, notice of the decision on a subsequent application is not required to be given to the default trustor before notice of a trustee's sale can be filed under section 57-1-25(1).[10]

---

10. We note that California has a similar provision: "In order to minimize the risk of borrowers submitting multiple applications for first lien loan modifications for the purpose of delay, the

(continued…)

¶41    Thus, if after consideration of the conflicting evidence presented by both parties on what documents were submitted by the Brimhalls before April 20, the factfinder determines that the Brimhalls did not timely submit a complete loss mitigation application, the court should also reject any argument that subsequently submitted applications retriggered the statutory duties in Utah Code section 57-1-24.3. In other words, even if the Brimhalls are correct in asserting that they submitted second and third applications for mortgage relief, Ditech would not have been required to notify the Brimhalls about its decision on those subsequent mortgage relief applications before proceeding with the sale of the Property if their first application had been properly rejected on grounds of incompleteness and written notice of that decision had been provided to them.

CONCLUSION

¶42    Because the parties stipulated to dismissing BNYM and because BNYM was not an indispensable party to the Brimhalls' claims against Ditech, the district court did not err in dismissing BNYM from the RMA suit. However, the court's grant of summary judgment in favor of Ditech was in error because a genuine dispute of fact exists about whether the Brimhalls timely submitted a complete RMA application.

¶43    Reversed and remanded.

_____

(…continued)
mortgage servicer shall not be obligated to evaluate applications from borrowers who have been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of this section . . . ." Cal. Civ. Code § 2923.6(g) (West 2019).